UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| BOBBIE J. RODGERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:16-CV-00010 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Bobbie J. Rodgers (Plaintiff) seeks review of the decision of the acting Social Security Commissioner, Nancy A. Berryhill, denying Plaintiff's application for Disability Insurance Benefits under the Social Security Act. Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.[2]

*I.  Background and Procedural History*

On February 5, 2013, Plaintiff filed an application for Disability Insurance Benefits.[3] (Tr. 172-86). The application alleged disability beginning on December 17, 2012, and was based on the following medical conditions: back problems, fibromyalgia pain, nerve damage, muscle spasms, diabetes, nodules on feet, and neuropathy in feet. (Tr. 58). On May 30, 2013, the Social Security Administration (SSA) denied Plaintiff's claim, and she filed a timely request for a

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 7).
[3] Plaintiff previously filed for benefits and was denied on October 26, 2006. (Tr. 208).

hearing before an administrative law judge (ALJ). (Tr. 84-90, 91-92). In a decision dated September 17, 2014, the ALJ found that Plaintiff "has not been under disability within the meaning of the Social Security Act from December 17, 2012, through the date of this decision." (Tr. 20). The SSA Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision on December 15, 2015. (Tr. 1-3). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.   The Administrative Proceeding

### A. Testimony at Hearing

Plaintiff appeared with counsel at the administrative hearing on August 28, 2014. (Tr. 38). Plaintiff testified that she had a tenth-grade education, lived with her son and his fiancée, and was last employed as a housekeeper at a nursing home. (Tr. 42). Prior to that, Plaintiff worked as a foster-care provider. (Id.).

Plaintiff testified that she suffered from three herniated discs in her back, fibromyalgia, diabetes with neuropathy, "bad anxiety," and migraines. (Tr. 42-43, 49). As a result of these conditions, Plaintiff was only able to walk for five to ten minutes at a time, sit for twenty to thirty minutes, and stand in one place for "about five minutes, if that." (Tr. 43-44). Plaintiff stated that she had difficulty holding anything in her left hand and that she could carry a gallon of milk a short distance, but it "pinches [her] back really bad." (Id.). Standing up too quickly also made Plaintiff's back "pinch," causing her to "just fall back down." (Tr. 48). Plaintiff's high blood sugar caused dizziness, nausea, and shaking. (Tr. 46). Her neuropathy caused numbness and tingling in her legs and feet that was painful and made standing or walking difficult. (Tr. 46-47). Plaintiff also testified that she suffered from migraines at least three times per week, with

each headache lasting about twenty-four hours and the "symptoms afterwards last[ing] about two days." (Tr. 49).

Plaintiff said her anxiety caused physical symptoms, like shaking legs and high blood pressure, when she was "really nervous" or around people she did not know. (Tr. 47). Plaintiff also stated that she suffered from depression which caused her to "have bad thoughts" and crying spells four to five times per week. (Id.).

Plaintiff testified that she had a driver's license and drove herself "probably every two weeks" to doctor appointments. (Tr. 44). Plaintiff could dress and bathe herself, but her son stayed nearby while she showered because Plaintiff had fallen several times. (Id.). As for housework, Plaintiff stated she could do dishes, but only for five to ten minutes at a time before she would have to sit down, and her son or his fiancée usually cooked and cleaned. (Tr. 44-45).

On a typical day, Plaintiff stated she would be "up all hours of the night and day" and sleep when possible, usually three to four hours at a time. (Tr. 45). She would spend most of her time lying down watching television or reading, sometimes visiting her sister who "live[d] in the yard with [her]." (Id.). Plaintiff testified that when she was lying down reading or watching television, she was usually in her bedroom because she had "withdrawals" and did not want to be around people because she could not concentrate. (Tr. 48). When Plaintiff had a migraine, she would also stay in her bedroom because light made her nauseous and "it's really dark in there." (Tr. 49).

Plaintiff testified that she underwent back surgery "for [her] sciatic nerve." (Tr. 48). After that surgery, she received two injections to treat her back pain, and her doctor recommended trying one more before undergoing a second back surgery that would consist of "putting a rod in there and some screws, and try to fuse [the three lower discs]." (Tr. 48-49).

A vocational expert, Denise Weaver, also testified at the hearing. (Tr. 50). The ALJ asked Ms. Weaver to consider a hypothetical claimant with the same age, education, and work history as Plaintiff who was limited to:

> sedentary work with a sit/stand option, allowing the person to sit or stand alternatively at will, provided the person is not off task by [sic] 10 percent of the work period; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional stooping, crouching, kneeling, and crawling; must avoid all use of hazardous machinery…and all exposure to unprotected heights. Work is limited to simple…routine and repetitive tasks with no strict production quota, with the emphasis being on a per-shift rather than a per-hour basis.

(Tr. 52-53). Ms. Weaver testified that, with these restrictions, the hypothetical individual would not be able to do any of Plaintiff's past work, but would be able to do other jobs existing in the national economy, such as dowel inspector or lens inserter. (Tr. 53).

Ms. Weaver stated the additional limitations of only occasional interaction with the general public and coworkers and no crouching, kneeling, or crawling, would not alter her finding that there were available jobs. (Tr. 54). However, when the ALJ further limited the hypothetical to "be[ing] off task by [sic] 20 percent of the day in addition to regularly scheduled breaks[,]" Ms. Weaver testified that these restrictions would preclude the individual from all work. (Id.). Ms. Weaver also stated that if the hypothetical individual continually needed two or more unscheduled absences a month, the individual would be precluded from all work. (Id.). Finally, Ms. Weaver testified that, if the individual needed to exercise the sit/stand option every ten to fifteen minutes and it interfered with the job, all available jobs would be eliminated. (Tr. 56).

  B. *Relevant Medical Records*

On December 5, 2012, prior to the alleged onset date, Dr. Jeff Lehmen performed a "hemilaminotomy, foraminotomy lumbar 5 to sacral 1; disc excision under microscopic

4

assistance" to treat Plaintiff's lower back pain. (Tr. 322). At a follow-up appointment on December 17, 2012, Plaintiff continued to complain of a constant ache in her lower back and shooting pain in her right hip. (Tr. 329). Dr. Lehmen noted that Plaintiff still rated her pain at a four out of ten, but also noted Plaintiff's "function and pain improved." (Id.).

In February 2013, Plaintiff met with her primary care physician, Dr. Robert Mason, for depression and a diabetes checkup. (Tr. 346). Dr. Mason recorded that Plaintiff's back motion was "more moderately limited[,]" but "pain does continue and she may need future surgery[.]" (Id.). Plaintiff also complained of uncontrolled levels of blood sugar and numbness in her legs and feet with pain at times. (Id.). Dr. Mason discontinued Plaintiff's Metformin and prescribed Lantus SoloStar Solution, refilled Plaintiff's Tramadol and Flexeril prescriptions, and increased Plaintiff's Neurontin. (Tr. 346-47).

Plaintiff completed a Function Report for the SSA in February 2013. (Tr. 228-39). Plaintiff reported she made her bed "if I can" and washed dishes, but she only washed a few at a time and took breaks. (Tr. 229). She stated that she did laundry twice a week, with two or three loads taking the entire day to complete. (Tr. 231). Plaintiff's husband did all of the cooking because her back pain made it difficult to stand long enough to cook. (Tr. 230, 231). Plaintiff also reported that she could not sleep more than two to four hours at a time because of back pain, did not go outside frequently because she had difficulty walking and feared falling, drove to doctor appointments, sewed for one to two hours per week, and went grocery shopping weekly with her husband but "sometimes" used the electric carts or waited while her husband did the shopping. (Tr. 230-33).

In May 2013, Dr. Stephen Williamson completed a consultative exam at the request of the SSA. (Tr. 354-59). Dr. Williamson noted that Plaintiff "seem[ed] to be a reliable historian."

5

(Tr. 354). Plaintiff reported that: her blood glucose averaged a value of 116; she had daily low blood sugar which caused her to be shaky, nauseous, and sweaty; and her current diabetes symptoms included "pain, decreased sensation in her toes, paresthesias in her feet and hands, ulcers and retinopathy." (Id.). Plaintiff described "sharp pain in her lower back on the right side[.]" (Id.). Plaintiff also reported that repositioning helped the pain, but lifting and bending exacerbated the problem. (Id.).

Dr. Williamson observed that Plaintiff was in "obvious discomfort from the pain in her right buttock" and had a waddling gait, but also a normal station, did not favor one leg, and did not require an assistive device to walk. (Tr. 356-57). He also noted that Plaintiff could move from a chair to the examination table, maneuver to and from the supine position, and stand on heels and toes "with some difficulty," but could not squat or touch her toes. (Tr. 358). Plaintiff's muscles had normal bulk and tone and a four out of five strength rating. (Tr. 357). Dr. Williamson found that Plaintiff's feet had sensory and vibratory sensation impairments, but did not have nodules. (Tr. 357-58). Dr. Williamson's exam revealed only ten positive fibromyalgia pressure points, where eleven positive points are necessary for a positive diagnosis. (Tr. 358, 364). Based on this exam, Dr. Williamson found that Plaintiff could: sit occasionally; stand and walk occasionally; lift and carry up to twenty pounds occasionally; reach, handle, and finger continuously but with limitations from upper extremity weakness; never kneel crouch, or crawl; balance continuously; climb occasionally; see and speak without limitation; and tolerate unlimited heat, cold, and vibration. (Tr. 359).

In late May 2013, Dr. Kenneth Smith completed a medical evaluation based on Plaintiff's medical records. (Tr. 64-66). Dr. Smith opined that Plaintiff's subjective reports of her limitations were only "partially credible when compared to the medical evidence in file." (Tr.

6

65). Based on his review of the records, Dr. Smith found that Plaintiff could: occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour period; sit six hours in an eight-hour period; push and pull unlimited amounts, with the exception of the weight limitations on lifting and carrying; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 65-66).

Upon referral from Dr. Mason, Plaintiff saw Dr. Craig Kuhns at the Missouri Orthopaedic Institute in July 2013 for lower back pain existing for over one year and left thigh pain existing for one week. (Tr. 503-05). Dr. Kuhns noted that Plaintiff had a normal gait, tenderness to palpation in the lumbar spine, and a good range of motion in the spine. (Tr. 504). X-rays of the lumbar spine taken that day revealed "decreased disk height at the L4-L5 and L5-S1 levels." (Id.). Dr. Kuhns explained to Plaintiff that she might have disk herniation, but recommended trying the conservative treatment method of rest and anti-inflammatories before considering steroid injections or surgery. (Id.). Plaintiff agreed to the conservative treatment method, and Dr. Kuhns advised her to return if the pain continued or became "acutely worse." (Id.)

Plaintiff met with Dr. Philip Kurle in October 2013, for migraine headaches and black-out spells. (Tr. 369). Dr. Kurle's physical examination revealed gait and station "within normal limits, intact tandem gait, intact heel walking, and intact toe walking." (Tr. 370). Dr. Kurle increased Plaintiff's dose of Neurontin to treat her migraine headaches. (Tr. 371).

Plaintiff presented to an emergency room on February 13, 2014 with "increasing erythema and warmth of the left thigh" and remained hospitalized until February 17, 2014. (Tr. 541-45). Dr. Robert Cooper noted that Plaintiff's only musculoskeletal pain was in her left leg,

and he found no joint swelling, tenderness, or decreased range of motion. (Tr. 544). At the time of her discharge, Dr. Joshua Brickner diagnosed Plaintiff with an "abscess/cellulitis" of the left thigh, uncontrolled diabetes mellitus, depression, and chronic pain syndrome. (Tr. 541). Dr. Brickner added Lantus and Humalog to Plaintiff's medications. (Tr. 542).

Plaintiff followed up with Dr. Kurle on February 18, 2014 and stated she was still experiencing regular headaches but had not recently lost consciousness. (Tr. 367-68). Dr. Kurle ordered an MRI, started Plaintiff on sumatriptan succinate and metoclopramide HCL, and increased Plaintiff's Neurontin. (Tr. 368). The MRI results were negative for any abnormalities. (Tr. 374).

Later that month, Plaintiff visited the Missouri Orthopaedic Institute and saw Adult Health Clinical Nurse Specialist (AHCNS) Laura Billings. (Tr. 506-07). Plaintiff complained that the treatment by rest and anti-inflammatories she tried after her July 2013 visit was no longer helping with her back and left leg pain, and she now had right lower extremity pain as well. (Tr. 506). Plaintiff rated her pain level at an eight out of ten and said that her primary care physician was treating the pain with Soma and Vicodin. (Id.). AHCNS Billings noted Plaintiff's back was "tender to palpation" and Plaintiff had: "limited flexion and extension due to pain"; patellar reflexes rated at a one out of four; difficulty performing a heel/toe tandem walk; and a positive Romberg test, strait leg raise, and Faber test on the right side. (Tr. 507). AHCNS Billings ordered an x-ray, which showed mild spondylotic changes and decreased disk height between L5-S1 that had not progressed since July 2013. (Tr. 507-08).

In March 2014, Plaintiff underwent an MRI of the lumbar spine, which revealed disc bulges at L3-4, L4-5, and L5-S1. (Tr. 511). Plaintiff had "experienced a re/re [sic] herniation at L5-S1," but AHCNS Billings noted that it was not clear from where Plaintiff's pain originated

because there were disc protrusions at several levels. (Id.). AHCNS Billings decided to try "diagnostic lidocaine injections" at several locations along Plaintiff's spine to identify where the pain was coming from, noted she would "most likely" refer Plaintiff for decompression, and recommended Plaintiff increase her gabapentin dosage and start taking a limited dose of Flexeril. (Id.). In April 2014, Dr. Joel Jeffries injected anesthesia at L5-S1. (Tr. 512). After the injection, Plaintiff rated her pain as a zero out of ten. (Tr. 512).

Plaintiff saw Dr. Mason in May 2014, seeking refills of Synthroid and Vicodin. (Tr. 592-92). Dr. Mason noted that Plaintiff "continue[d] to complain of back pain" and had tenderness and spasm of the musculature around the lumbar spine with restriction of motion in the area. (Tr. 592). At a visit with AHCNS Billings the same month, Plaintiff reported that she was "doing a little better after her epidural steroid injection" but was still "feeling significant pain." (Tr. 514). AHCNS Billings interpreted these results to mean that Plaintiff "experienced relief largely from the systemic effects of the steroid, rather than accurately targeting her pain generator." (Tr. 513). Plaintiff was not interested in surgery at the time, and wished to try another steroid injection. (Tr. 514). In June 2014, Plaintiff received another steroid injection and reported her pain level did not immediately decrease. (Tr. 515).

In late June 2014, Plaintiff saw Dr. Kurle for her migraines, depression, and back pain. (Tr. 365-66). Plaintiff reported she was still experiencing headaches two to three times per month and her medication was not fully controlling the problem. (Tr. 365). Dr. Kurle noted that gabapentin "had been helpful for back pain and other issues" and that Plaintiff's neuropathy "is not bothersome for her most of the time." (Id.).

Plaintiff visited Dr. Mason for a sore on her right foot and medication refills in July 2014. (Tr. 587-88). Dr. Mason referred Plaintiff to a podiatrist for the lesion on her foot and refilled

9

Plaintiff's Prozac, Soma, Pen Needles, and Vicodin. (Id.). Imaging of Plaintiff's right foot in July 2014 showed no acute abnormalities. (Tr. 522).

From May 2013 until July 2014, Plaintiff received mental health treatment services for major depressive disorder and generalized anxiety disorder at Pathways Behavioral Health Family Counseling Center. (Tr. 375-499). Plaintiff's visits ranged from weekly to biweekly depending on her symptoms. (Id.). During a September 26, 2013 appointment, Plaintiff expressed an interest in volunteer work but said she was too busy helping her son and would consider it again at a later date. (Tr. 420-21).

On September 29, 2014, after the ALJ issued his decision denying benefits, Plaintiff visited Dr. Mason. (Tr. 584-86). At this visit, Dr. Mason prescribed Diflucan and triamcinolone acetonide cream for Plaintiff's back pain. (Tr. 584).

C. *The ALJ's Determination*

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. § 404.1520[4] and found that Plaintiff: (1) had not engaged in substantial gainful activity since December 17, 2012; (2) had the severe impairments of disorder of the back, fibromyalgia, diabetes mellitus with neuropathy, major depressive disorder, and anxiety disorder, and the non-severe impairments of transient loss of consciousness and migraine headaches; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 20-33).

---

[4] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520(a). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except for the following nonexertional limitations that reduce the claimant's capacity for sedentary work: must be able to alternate between sitting and standing positions at will provided they are not off task more than ten percent of the work period; can never climb ladders, ropes or scaffolds; can only occasionally climb ramps or stairs; can only occasionally stoop, kneel, crouch, or crawl; must avoid exposure to the use of hazardous machinery, defined as unshielded moving machinery, and unprotected heights; limited to simple, as defined in the Dictionary of Occupational titles ("DOT") as specific vocational preparation ("SVP") levels one and two, routine, repetitive tasks; and must not be required to comply with a strict production quota, defined as a per shift not per hour basis.

(Tr. 25). While the ALJ found that objective medical evidence "supports the existence of medically determinable impairments that could reasonably be expected to cause the alleged symptoms," he did not believe the evidence supported Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms." (Tr. 26). The ALJ determined that Plaintiff's testimony about her symptoms was "not entirely credible" because Plaintiff's activities of daily living were inconsistent with her complaints, Plaintiff's medical treatments were "routine or conservative in nature" with the exception of her December 2012 back surgery that was "generally successful," and Plaintiff had a sporadic work history. (Tr. 28-29).

Based on the ALJ's RFC determination and the vocational expert's testimony, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 31). At step five of the evaluation process, the ALJ determined that Plaintiff was capable of performing other jobs that existed in significant numbers in the national economy, and therefore was not disabled under the Social Security Act. (Tr. 32).

### III.   *Standard of Judicial Review*

The court must affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole. Buford v. Colvin, 824 F.3d 793, 795 (8th Cir. 2016); 42 U.S.C. § 405(g).

"Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quotation omitted). In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). However, the court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### IV. Discussion

Plaintiff claims the ALJ erred by: (1) improperly determining that Plaintiff was not credible; and (2) improperly weighing medical opinion evidence. The Commissioner counters that: (1) substantial evidence supports the ALJ's credibility determination; and (2) in weighing the medical opinion evidence, the ALJ acted within his discretion to resolve conflicts in the record.

*A. Credibility Determination*

Plaintiff first argues that the ALJ improperly evaluated her credibility. Specifically, Plaintiff challenges the ALJ's determination that her daily activities were inconsistent with her allegations of disability and asserts that the ALJ selectively cited from the record. In response, the Commissioner argues that substantial evidence supports the ALJ's determination.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In making a credibility determination, an ALJ should "give full consideration to all of the evidence presented relating to subjective complaints," including a claimant's work history, and observations by third parties and physicians regarding: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

The ALJ considered Plaintiff's activities of daily living and noted that, according to Plaintiff: "the only problems she has with personal care are bending over to put on sock [sic] and shoes, and getting in and out of the bathtub"; and "she could launder, wash dishes, go outside, drive a car, go shopping, manage her finances and sew." Additionally, Plaintiff reported in July 2013 that "she did well with day-to day activities" and in September 2013 that "she was keeping herself busy, helping her son and her [sic] fiancée, and was interested in volunteer work." (Tr. 28). For these reasons, the ALJ found that "[b]ased upon the totality of the evidence, the claimant has engaged in substantial activities of daily living" which are "inconsistent with her complaints of disabling symptoms and limitations[.]" (Id.).

13

As Plaintiff asserts, the ALJ's description of Plaintiff's daily activities omits some performance limitations Plaintiff testified to at the hearing and included in her February 2013 Function Report. For example, the ALJ cited the Function Report when finding Plaintiff can do laundry, wash dishes, and sew but did not mention Plaintiff's statements in the same report that: her husband usually did the laundry as two to three loads would take her an entire day to complete; she had to take breaks while washing dishes so a small amount took approximately an hour; and Plaintiff only sewed one to two hours per week because she could not sit for long periods of time. However, given that these limitations were included in the same document the ALJ cited in support of his findings, it is unlikely that the ALJ did not also consider these limitations. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (when an ALJ incorporated some information from a doctor's treatment notes but not other information from the same notes, it is "highly unlikely that the ALJ did not consider and reject" the information not incorporated in the decision). Furthermore, while the ALJ might have overstated the extent of Plaintiff's daily activities, the record demonstrates that Plaintiff is generally able to care for herself. See Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010).

Plaintiff is also correct that an ability to perform sporadic, light activities does not demonstrate an ability to perform full-time, competitive work. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000)). However, daily activities that are inconsistent with subjective complaints may support an adverse credibility determination. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013); Goff , 421 F.3d at 792 ("acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility") (quotation omitted). Here, in addition to noting Plaintiff's ability to do

some laundry, dishes, and sewing, the ALJ relied upon Plaintiff's statement that she "did well" with daily activities and was interested in volunteer work.

The record also contains other inconsistencies. For example, at the administrative hearing, Plaintiff testified that she could sit for only twenty to thirty minutes at a time yet, in April 2014, Plaintiff told her social worker that she recently "decided to go visit another friend and rode with him on his truck run through four states." (Tr. 44, 469). Such evidence supports the ALJ's finding that inconsistencies between Plaintiff's daily activities and subjective complaints render her complaints less credible. See Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005) ("A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole").

Importantly, the ALJ's determination that Plaintiff's daily activities were inconsistent with her allegations of disability was merely one of the factors the ALJ addressed while explaining his overall credibility determination. Other reasons for his determination included inconsistencies between Plaintiff's complaints and the objective medical evidence, the methods of treatment used, and Plaintiff's work history.

The ALJ found that the nature and frequency of the medical treatment Plaintiff received was not what "one would expect for a disabled individual." (Tr. 28). The ALJ noted that Plaintiff's back surgery in December 2012 was "generally successful in relieving the symptoms and stabilizing the claimant's condition" and that, since the surgery, treatment for Plaintiff's physical impairments has been "essentially routine or conservative in nature." (Id.).

Plaintiff challenges these assertions by highlighting the various treatments she received during the relevant time period. The ALJ detailed these treatments in his decision, however, while discussing the objective medical evidence supporting and detracting from Plaintiff's

subjective complaints of disability. The ALJ's detailed discussion of Plaintiff's medical records suggests that he considered those treatments when he assessed the nature and frequency of Plaintiff's medical treatment, and the Court will defer to the ALJ's determination. To the extent that Plaintiff asks the Court to reevaluate the evidence and reach a different conclusion, the Court declines to do so. See Guilliams, 393 F.3d at 801 ("[E]ven if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole.").

Finally, the ALJ considered Plaintiff's work history. The ALJ noted that Plaintiff's sporadic work history and poor earnings before the alleged onset date "do not enhance the credibility of her allegations." (Tr. 29). "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." Pearsall, 274 F.3d at 1218 (citing Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993)).

Based on the above, the Court finds that substantial evidence supported the ALJ's determination that Plaintiff was not entirely credible. Because the ALJ provided "good reasons" for discrediting Plaintiff's testimony, the Court defers to the ALJ's credibility determination. See Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) ("Credibility determinations are the province of the ALJ, and as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility, [a court] will defer to [the ALJ's] decision.") (quoting Guilliams, 393 F.3d at 801).

*B. Weight of Medical Opinion Evidence*

Plaintiff asserts that the ALJ improperly assigned greater weight to the opinion of a non-examining state agency medical consultant than that of an examining consultative examiner

when making the RFC determination.[5] Plaintiff argues that, because "the longitudinal history available to both of these sources was nearly identical," the opinion of the examining consultative examiner should be granted more weight than a non-examining medical consultant. (Pl.'s Br. 11). The Commissioner counters that the ALJ properly weighed the medical opinion evidence because the consultative examiner did not have access to Plaintiff's medical records, the consultative examiner's opinion was inconsistent with the record, and the ALJ acted within his discretion to resolve conflicts in the record.

An RFC determination is to be "based on all the relevant medical and other evidence in [the] record." 20 CFR § 404.1520(e). This includes medical records, observations of treating physicians and others, and an individual's own description of his or her limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. § 404.1527(c), (e)(2)(ii). When determining the appropriate amount of weight to give a medical opinion from a non-treating source, the ALJ considers the following factors: examining relationship, treatment relationship, supportability, consistency, and specialization. Wiese v. Astrue, 552 F.3d 728, 731 (8th Cir. 2009). See also 20 C.F.R. § 404.1527(c). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." Wagner, 499 F.3d at 848 (quoting Pearsall, 274 F.3d at 1219).

---

[5] The ALJ also considered opinion evidence in the form of: (1) a third party function report completed by Plaintiff's husband, to which the ALJ assigned "little weight"; (2) a report by Dr. Michael Stacy, a non-examining state agency psychological consult, to which the ALJ assigned "considerable but not full weight"; and (3) the various Global Assessment of Functioning scores in Plaintiff's records, to which the ALJ assigned "little partial weight." (Tr. 29-30). Plaintiff does not challenge the weight assigned to these opinions.

After acknowledging that non-examining sources are not generally afforded as much weight as examining sources, the ALJ assigned Dr. Smith, a non-examining state agency consultant, "considerable but not full weight." (Tr. 29). The ALJ found that Dr. Smith's work as a state agency consultant made him "well versed in the Social Security Act and regulations, including all pertinent definitions and procedures utilized…in determining whether an individual is entitled to disability benefits[.]" (Id.). The ALJ also noted that Dr. Smith's opinions were "generally consistent" with the objective medical evidence in the record as a whole. (Id.).

The ALJ assigned the examining consultative examiner, Dr. Williamson, "less than moderate weight" because his opinion was based on one examination and was "only moderately reflective of the longitudinal evidence of the claimant's functioning." (Id.). The ALJ also found that Dr. Williamson's final opinion had some inconsistencies with his own exam notes. For example, the ALJ highlighted that Dr. Williamson limited Plaintiff's ability to stand because of right hip pain and lower extremity weakness, but in his notes from the examination, Dr. Williamson's rated Plaintiff's lower extremity strength at a four out of five.

The Commissioner asserts that the ALJ properly discounted Dr. Williamson's opinion because Dr. Williamson did not have access to Plaintiff's medical records when formulating his opinion. A close examination of Dr. Williamson's report suggests that he had access to at least some of Plaintiff's medical records at the time of the exam. (Tr. 358). However, the ALJ assigned Dr. Williamson less weight because his opinion was inconsistent with findings in his own exam and the record as a whole, not because of the amount of evidence he used to formulate that opinion. "[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion." Goff, 421 F.3d at 790-91. See also Pearsall, 274 F.3d at 1219.

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided reasonable explanations for the weight he accorded Dr. Smith's and Dr. Williamson's opinions. Because substantial evidence in the record as a whole supports the ALJ's decision to assign considerable weight to Dr. Smith and "less than moderate weight" to Dr. Williamson, the Court will not disturb that determination. "If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010).

## V. *Conclusion*

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

/s/ Patricia L. Cohen
_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 13th day of September, 2017